IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 15, 2015


**STATE OF TENNESSEE v. CARLOS CAMPBELL**


**Appeal from the Criminal Court for Knox County**
**No. 101406     Steven Wayne Sword, Judge**

_____


**No. E2015-00730-CCA-R3-CD – Filed March 3, 2016**

_____


Appellant, Carlos Campbell, stands convicted of two counts of aggravated assault, for which the trial court sentenced him to an effective term of six years' incarceration. On appeal, appellant argues that the evidence was insufficient to support his convictions and that his statement to the police should have been suppressed. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, SP. J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Leslie M. Jeffress (on appeal); and Bruce Poston (at trial), Knoxville, Tennessee, for the Appellant, Carlos Campbell.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha M. Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.


**OPINION**

This case concerns a shooting near Austin East High School in Knoxville, Tennessee, involving multiple parties and victims. One person was injured but survived. Appellant, Laquinton Brown, Lajuan Harbison, and Arterious North were charged by presentment for various offenses related to the shooting:

| Count | Defendant(s) | Offense | Victim |
|---|---|---|---|
| 1 | Laquinton Brown Carlos Campbell | Attempted Especially Aggravated Robbery (by violence) | L.P.[1] |
| 2 | Laquinton Brown Carlos Campbell | Attempted Especially Aggravated Robbery (by putting in fear) | L.P. |
| 3 | Laquinton Brown Carlos Campbell | Attempted Aggravated Robbery (by violence) | Q.T. |
| 4 | Laquinton Brown Carlos Campbell | Attempted Aggravated Robbery (by putting in fear) | Q.T. |
| 5 | Laquinton Brown Carlos Campbell | Attempted First Degree Murder | Lajuan Harbison |
| 6 | Laquinton Brown Carlos Campbell | Attempted First Degree Murder | Arterious North |
| 7 | Laquinton Brown Carlos Campbell | Attempted First Degree Murder | Montiere King |
| 8 | Laquinton Brown Carlos Campbell | Employing a firearm during the commission of a dangerous felony | |
| 9 | Laquinton Brown Carlos Campbell | Employing a firearm during the commission of a dangerous felony | |
| 10 | Laquinton Brown Carlos Campbell | Employing a firearm during the commission of a dangerous felony | |
| 11 | Arterious North Lajuan Harbison | Attempted First Degree Murder | L.P. |
| 12 | Arterious North Lajuan Harbison | Attempted First Degree Murder | Laquinton Brown |
| 13 | Arterious North Lajuan Harbison | Attempted First Degree Murder | Carlos Campbell |
| 14 | Arterious North Lajuan Harbison | Attempted First Degree Murder | M.W. |
| 15 | Arterious North Lajuan Harbison | Employing a firearm during the commission of a dangerous felony | |
| 16 | Arterious North Lajuan Harbison | Employing a firearm during the commission of a dangerous felony | |
| 17 | Arterious North Lajuan Harbison | Employing a firearm during the commission of a dangerous felony | |
| 18 | Arterious North Lajuan Harbison | Employing a firearm during the commission of a dangerous felony | |

---

[1] It is the policy of this court to protect the identity of minor victims and witnesses. Therefore, we will use initials for each minor involved in this case.

The State dismissed counts seven and ten prior to trial. The trial judge granted appellant's motion for a judgment of acquittal on counts one and three and partially granted the motion on counts two and four by lowering the charges to aggravated assault. The jury convicted appellant of aggravated assault for counts two and four and acquitted him of the remaining charges. The trial court sentenced appellant to six years for each conviction, to be served concurrently.

## I. Facts

Because appellant was acquitted of many of the charges against him, we will limit our summary of the trial testimony to facts pertinent to his convictions.

Michael Allen Mays, the records keeper for the Knox County Emergency Communications District ("9-1-1"), testified that 9-1-1 received a call from 2800 Martin Luther King Jr. Avenue at 4:31 p.m. on September 7, 2012.

Linda Detienne, a bus operator for Knoxville Area Transit, testified that she was driving on Martin Luther King Jr. Avenue just past Austin East High School around 4:30 p.m. when she had to stop because a car ahead of her had stopped in the lane of traffic. She said that there was one car between her bus and the stopped car, which she recalled was gold in color. A young black man exited the gold car and approached two boys on the sidewalk. Ms. Detienne explained that the young man said something to the boys and that the boys turned out their pockets. She testified that the boys did not have anything in their pockets and that the young man returned to the gold car, retrieved a gun, and began firing. She recalled that the gold car's door had remained open.

On cross-examination, Ms. Detienne testified that the driver of the gold car drove away as soon as the shooting began. She agreed that there were girls on the sidewalk. She said that the young man initially aimed at and fired on the boys on the sidewalk but that he then ran away, firing more shots into the air.

Malaika Rhonda Guthrie testified that she was a teacher at Austin East High School. On September 7, 2012, she said that she was on her way to Vine Middle School from Austin East High School around 4:30 p.m. and that she had her daughter and her daughter's friend in the car with her. Ms. Guthrie said that she had to stop on Martin Luther King Jr. Avenue because the dark-colored car in front of her had stopped. She explained that there was no stop sign or any other reason for the car to have stopped. Ms. Guthrie said that a man got out of the car in front of her and approached two male students on the sidewalk. She testified that the car's door remained open. Ms. Guthrie described the man's demeanor as "aggressive . . . not cordial." The man confronted the students, who pulled their pockets out. She testified that when the man turned back

-3-

towards the car, she began hearing gunfire that she described as "tow, tow, tow-tow-tow-tow-tow." Ms. Guthrie said that she did not see any guns and that she ducked down in her car. She testified that "when the car [in front of her] pulled off . . . [Q.T.] started screaming and yelling, and they're shooting. They're shooting, and then [L.P.] fell—well, he was standing at first, and he kept saying, 'I been hit. I been hit,' and so he couldn't move." She clarified that the shooting had stopped when the car in front of her drove away.

On cross-examination, Ms. Guthrie testified that the car in front of her potentially could have driven away during the shooting. She said that she was sure that the man who had exited the car was on the sidewalk with the students when the shooting began and that he got back into the car.

A.G., Ms. Guthrie's daughter, testified that she knew L.P. because they were in the same grade at Vine Middle School. She remembered a man getting out of the front passenger seat of the car that had stopped in front of her mother's car. The man approached the students on the sidewalk, and the students turned out their pockets. A.G. said that she saw a dark car drive by in the other lane of traffic and that the shooting began from the dark car. The people in the car in front of her mother's car began returning fire. On cross-examination, A.G. agreed that she told police that the man who had exited the car pulled out a gun and began firing back at the dark car. She was not sure where he was when he began firing. She further agreed that she never said anything to the police about anyone firing from the gold car.

S.W. testified that L.P. was her cousin. On the day that L.P. was shot, she recalled sitting outside with a group of freshman near Austin East High School. She said that she saw a car drive by twice with several people inside who were listening to loud music. S.W. testified that on the third pass, the car stopped in front of her group, and one man exited. She said, "He stepped up to [L.P.] and [Q.T.] and tried to rob them." According to her, the man told them his name, where he was from, and that he was with the Crips or Bloods, and then, the man "stepped back and pulled a gun out and started shooting." After that, another passenger from the car exited and began shooting. S.W. recalled that the driver watched from the car while the man who had exited talked to L.P. and Q.T. She recognized one of the passengers in the car as M.W. (the named victim in the fourteenth count of the indictment in this case). S.W. testified that the second time that the car had driven by, the passengers were "throwing Crip signs."

Q.T. testified that the day that L.P. was shot, he saw a car drive by twice. The second time, he made a hand signal toward the car because he believed his brother was in the back seat. The car stopped, and the front passenger exited. The front passenger asked his group, "'Which one of y'all threw a Blood?'" They responded, "'We don't bang.'" Q.T. noticed that the man had a gun in his waistband. The man told him to

-4-

empty his pockets. As Q.T. was complying, people started shooting from another car. He and L.P. tried to run away, but L.P. fell. Q.T. recalled seeing the man who had approached them running away, returning fire at the people shooting at him.

L.P. testified that the day he was shot, he had not attended school. After school was over, however, he met Q.T. and S.W. on Martin Luther King Jr. Avenue. He recalled seeing a car drive by two or three times. He testified that the car stopped, someone exited, and that person began talking to Q.T. L.P. described what followed:

> He like [sic], "Which one of y'all threw up that Blood?" And he was like, "Didn't nobody throw up that Blood." He was like, "Empty your pockets." So [Q.T.] emptied his pockets. I was standing there. Another car pulled up, start shooting, and we were standing there. A bullet hit the wall. We looked at each other. I tried to take off[;] I fell.

L.P. recalled that the passenger who had approached them had a gun in his waistband. When the shooting began, the passenger crossed the street and started shooting "[t]owards Austin East." L.P. testified that he was shot in the arm and stomach. Because a bullet hit a nerve, he had to learn to walk again.

Testimony from evidence technicians and a firearms examiner showed that a Chevrolet Malibu and a Chevrolet Cobalt had each been hit multiple times by bullets. At least three separate weapons were used. L.P. was shot by a .45 caliber bullet that bore markings consistent with having been fired by a Hi Point gun. The .45 caliber bullet from L.P. was also consistent with a .45 caliber bullet taken from the Chevrolet Malibu, but the technician could not say with one hundred percent accuracy that they were fired from the same gun.

Knoxville Police Officer Bryan Wardlaw testified that he participated in an interview of Laquinton Brown, appellant's codefendant. Parts of codefendant Brown's interview were played for the jury. During his interview, codefendant Brown said that the boys on the sidewalk had "thrown" gang signs. He approached them and made them pull out their pockets to see whether they were carrying weapons. Codefendant Brown said that another car, a Chevrolet Cobalt, drove up and shots were fired. He said that he "hit the deck" and that the people he was with left him to die. He said that he did not have a gun and that he took a bicycle to return to his neighborhood.

Knoxville Police Investigator Chas Terry testified that he interviewed appellant on October 21, 2012. In the interview, appellant said he had driven to a street near Austin East High School and had stopped near a group of students. A car pulled up next to him, and gunshots came from that car. He did not see who was in the car. Appellant said that the next thing he knew, he was at a stop sign.

Knoxville Police Investigator Amy Jinks testified that she interviewed codefendants Lajuan Harbison and Arterious North. Codefendant Harbison admitted to firing a weapon during the Austin East incident. He told her that he had disposed of the gun he used. Codefendant North told Investigator Jinks that he had a .357, that "Monte" had a nine millimeter, that codefendant Harbison might have had a nine millimeter, and that the people in the backseat ("Monte" and "Little Paul") had a Glock and a Hi Point, but he wasn't sure which person had which gun. On cross-examination, Investigator Jinks testified that her investigation made clear that appellant had driven the gold car.

Following Investigator Jinks's testimony, the State rested its case-in-chief. Appellant and his codefendants moved for judgments of acquittal. The trial court partially granted appellant and codefendant Brown's motion as to counts one through four insofar as the trial court determined that there was no evidence upon which a reasonable person could determine that codefendant Brown intended to rob the victims. The trial court stated that it would submit counts two and four to the jury as aggravated assault charges and would dismiss counts one and three. The trial court denied appellant and his codefendants' motions for judgments of acquittal for each of the other counts of the indictment.

Codefendant Harbison testified in his own defense. He agreed that he had been carrying a nine millimeter and that he had used it during the incident. He stated that when he was driving on Martin Luther King Jr. Avenue that day, he thought he had to stop because of a stop sign on the side of a bus. As he was stopping, he saw a child being robbed, and he recognized L.P. and Q.T. Codefendant Harbison said that he never had "beef" with L.P. and Q.T. He claimed that he only shot after the person robbing L.P. and Q.T. shot. He also said that he was close enough to appellant's car that he "could have killed" the people in the other car "if [he] wanted to." He confirmed that appellant was driving the other car. He did not know whether appellant had a gun. Codefendant Harbison testified that the bullet hole on the hood of his Cobalt and one of the broken windows occurred when people shot at his car and house sometime before the Austin East shooting.

Codefendant Brown testified in his own defense. He testified that he did not have a gun on September 7, 2012. He said that he and appellant and two others were "riding around chilling" when they saw someone flag them down. He got out of the car to find out why the people had flagged them down. Codefendant Brown said that he went into "safety mode" when he realized that he did not know the people and told them to "raise their shirt up, empty out their pockets, check them for weapons." He said that he stepped back, heard a gunshot, and lay down in the street. Appellant drove away without him. On cross-examination, codefendant Brown said that he, his uncle, and appellant rented a vehicle the morning of the shooting, the same gold car they were in during the shooting.

After all parties rested their cases, the jury deliberated and found appellant guilty of two counts of aggravated assault and acquitted him of all remaining counts. The jury found codefendant Brown guilty of two counts of aggravated assault, two counts of attempted voluntary manslaughter as lesser-included offenses of attempted premeditated murder, and two counts of employing a firearm during the commission of a dangerous felony. The jury found codefendants North and Harbison guilty of four counts of attempted voluntary manslaughter as lesser-included offenses of attempted premeditated murder and four counts of employing a firearm during the commission of a dangerous felony.

Subsequently, the trial court sentenced appellant to concurrent sentences of six years for his aggravated assault convictions. There is no timely motion for new trial in the record, only an amended motion for new trial filed on March 20, 2015, nearly a year after sentencing.[2] Because the motion for new trial was not timely filed, the time for filing of the notice of appeal was not tolled. *See* Tenn. R. App. P. 4(c). Thus, the notice of appeal was likewise untimely filed. However, in the interest of justice, we will waive the untimely filing of the notice of appeal. *See* Tenn. R. App. P. 4(a).

## II. Analysis

### A. Sufficiency of the Evidence

Appellant argues that there was insufficient evidence to support his convictions and contends that the trial court should have granted his motion for judgment of acquittal with regard to all charges. Specifically, he states that the only evidence supporting his convictions was his own acknowledgment that he was driving the car from which codefendant Brown exited.

A motion for judgment of acquittal raises a question of law, i.e., the legal sufficiency of the evidence, for determination by the trial court. *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995) (citing *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)). Thus, on appeal, this court applies the same standard of review both to the trial court's denial of a motion for a judgment of acquittal and to the sufficiency of the convicting evidence underlying the jury's verdict. *State v. Carroll*, 36 S.W.3d 854, 869 (Tenn. Crim. App. 1999) (citing *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998)).

---

[2] We note that appellant's trial attorney died several months after the trial; however, his death occurred long after the time to file a motion for new trial had passed.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The State pursued a theory of criminal responsibility in this case. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Further, a person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2). While not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. *Dorantes*, 331 S.W.3d at 386 (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and

-8-

furthermore, the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *Ball*, 973 S.W.2d at 293. However, to be convicted, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

In order to sustain appellant's convictions, the State had to show that appellant was criminally responsible for the actions of codefendant Brown and that Brown committed aggravated assault. Aggravated assault, as charged in this case, is intentionally or knowingly committing an assault that "involved the use or display of a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii). "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2). Aggravated assault is a Class C felony. *Id.* § 39-13-102(e)(1)(A)(ii).

Viewed in the light most favorable to the State, the evidence at trial showed that appellant was driving with codefendant Brown and at least one other passenger. Appellant, codefendant Brown, and codefendant Harbison all acknowledged that appellant was driving the gold-colored car. He drove by a group of students at least twice and then stopped in the lane of traffic after one or more of the students made hand signals towards his car. Codefendant Brown exited the car and approached the students. Q.T. followed codefendant Brown's directions to turn out his pockets. At some point, codefendant Brown displayed a gun—either one he already had on his person or one retrieved from the car. The jury resolved the question of whether the victims were placed in fear against appellant and codefendant Brown. *See State v. Dotson*, 254 S.W.3d 378, 395-96 (Tenn. 2008) (noting that a victim's reactions are circumstances the jury can consider when determining if the victim had been in fear). Regarding criminal responsibility, the evidence that appellant stopped the vehicle in a traffic lane for codefendant Brown to exit is sufficient to show that appellant "in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)). Therefore, the evidence is sufficient to support appellant's convictions.

## B. Suppression of Appellant's Statement

Appellant contends that his statement to police should have been suppressed; however, while the issue was presented in the amended motion for new trial included in the record, there is no timely-filed original motion for new trial in the record before this court. "A motion for a new trial which is not timely filed is a nullity." *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989); *see* Tenn. R. Crim. P. 33(b) (setting time

limit for filing a motion for new trial). Therefore, this issue is waived. *See* Tenn. R. App. P. 3(e) ("in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived").

## CONCLUSION

Based on the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, SPECIAL JUDGE